## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

| | |
|---|---|
| LE DISCOUNT SEAFOOD, INC.; NAMTHI LE; MORGAN KIRKLAND; TOM WADE, INC., d/b/a NAUTICAL YACHT; and EDDIE BURGER d/b/a H2O OUTFITTERS, on behalf of themselves and all others similarly situated, | CASE NO. _____ |
| Plaintiffs | **JURY DEMAND** |
| vs. | |
| BP, PLC; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA, INC.; BP COMPANY NORTH AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.; ANADARKO PETROLEUM CORP.; MOEX OFFSHORE 2007, LLC; TRANSOCEAN LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; HALLIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION; and M-I, LLC; | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Le Discount Seafood, Inc.; Namthi Le; Morgan Kirkland; Tom Wade, Inc.,

d/b/a Nautical Yacht; and Eddie Burger d/b/a/ H2O Outfitters, individually and as

representatives of the class defined herein bring this class action against Defendants BP, PLC;

BP America, Inc.; BP Corporation North America, Inc.; BP Company North America, Inc.; BP

Products North America, Inc. ("BP"); Anadarko Petroleum Corp.; Moex Offshore 2007, LLC;

Transocean Ltd.; Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.;

Halliburton Energy Services, Inc.; Cameron International Corporation F/K/A Cooper Cameron

Corporation; and M-I, LLC as follows:

## I.    INTRODUCTION

1.      Plaintiffs are businesses and individuals who rely on the natural resources found

in the Gulf of Mexico, including fish, shellfish, oysters, and other aquatic life, for their

livelihood.  They bring this class action on behalf of themselves and all others similarly situated

against Defendants for losses and damages arising out of the catastrophic and avoidable oil spill

off the Gulf Coast caused by the April 20, 2010 explosion and fire aboard the Deepwater

Horizon oil rig ("Deepwater Horizon"), and the subsequent sinking of that rig and the discharge

of oil into the surrounding water.

2.      On April 20, 2010, the Deepwater Horizon, an oil rig in the Gulf of Mexico,

exploded and caught fire.  It burned for two days before tipping into the sea, on its way bending

and breaking the long riser pipe carrying oil to the surface from the seafloor.  As the Deepwater

Horizon sank, it broke off the riser, leaving the pipe leaking oil out of its now-open end as well

as through two breaks along its length.  An emergency valve, installed on the wellhead for just

such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the

Gulf waters.

3.      More than 5,000 barrels per day of crude oil have been leaking from the wellhead

and broken riser, bubbling up to the surface and flattening out into a widening slick of oil.  The

growing, fast-moving, rainbow-colored smear is large enough to be visible from outer space,

covering more than 9,100 square miles, and spreading with the wind and currents towards the

Louisiana, Mississippi, Alabama, and Florida coastlines.

4.      The spilled oil has already caused damage to the Gulf of Mexico's and Florida's

marine, coastal, and estuarine environments, which are used by Plaintiffs and the Class Members

- 2 -

to earn their livelihoods. With the wellhead unabated gushing of hundreds of thousands of gallons of oil per day into the waters near Florida, Plaintiffs and Class Members are suffering and will continue to suffer serious losses.

## II.   **PARTIES**

5.     Plaintiff Le Discount Seafood, Inc., is a Florida corporation with its principal place of business in Bay County, Florida. Le Discount Seafood, Inc. that derives its income from the purchase and sale of shrimp, fish and other seafood products caught in the Gulf of Mexico.

6.     Namthi Le is a resident of Bay County, Panama City, Florida. Ms. Le owns and operates Le Discount Seafood, Inc. and relies on it for her livelihood.

7.     Plaintiff Morgan Kirkland is a resident of Escambia County, Pensacola, Florida. He is a licensed commercial shrimper licensed in Florida, Alabama, and Mississippi, who relies on the supply of shrimp in the Gulf of Mexico for his livelihood.

8.     Plaintiff Tom Wade, Inc., d/b/a/ Nautical Yacht ("Nautical Yacht"), is a Delaware corporation with its principal place of business in Cortez, Florida. Nautical Yacht operates charter sportfishing boats off the coast of Florida in both Federal and state waters.

9.     Plaintiff Eddie Burger d/b/a H2O Outfitters is a Florida company operating charter sportfishing boats off of the coast of Florida the and in the Gulf of Mexico in both Federal and state waters. H2O Outfitters operates out of Venice, Florida.

10.     As a result of the events described herein, Plaintiffs have been harmed and suffered damages as a result of the contamination caused by the spill and the events alleged herein.

11.     Defendant BP, PLC is a British corporation, organized under the laws of the United Kingdom, doing business in the State of Florida and throughout the United States. BP is one of the world's largest oil companies.

-3-

12.     Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Florida and throughout the United States. BP America, Inc. is a subsidiary of BP, PLC.

13.     Defendant BP Corporation North America, Inc. (formerly BP Amoco Corporation), is an Indiana corporation with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. BP Corporation North America, Inc. is a subsidiary of BP America, Inc.

14.     Defendant BP Company North America, Inc. is a Delaware Corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Florida and throughout the United States. BP Company North America, Inc. is a subsidiary of BP Corporation North America, Inc.

15.     Defendant BP Products North America, Inc. is a Maryland corporation, with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. BP Products North America, Inc. is a subsidiary of BP Company North America, Inc.

16.     Defendants BP America, Inc., BP Corporation North America, Inc., BP Company North America, Inc. and BP Products North America, Inc. are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP."

17.     BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section of the outer continental shelf in the Gulf of Mexico. As of April 20, 2010, BP operated the Macondo oil well that is the source of the current oil spill.

18.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, but doing business in the state of Florida and within this District.  Anadarko is an oil and gas exploration and production company that owns a 25% interest in the Macondo well at Mississippi Canyon Block 252.

19.     Defendant MOEX Offshore 2007, LLC ("MOEX") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX Offshore 2007 holds a 10% interest in the Macondo well at Mississippi Canyon Block 252.

20.     Defendant Transocean Ltd. is a Swiss corporation doing business in the State of Florida and within this District. Transocean Ltd. is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

21.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.

22.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd. Transocean Offshore Deepwater Drilling, Inc. is the world's largest offshore drilling contractor.

23.     Defendants Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they shall be referred to herein collectively as "Transocean."

875654.2

24.     Transocean owned, and BP was leasing and operating, the Deepwater Horizon as it performed production well completion operations on the Macondo well on the outer continental shelf off the Gulf Coast, at the site from which the oil spill now originates.

25.     At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

26.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates, but doing business in the State of Florida and throughout the United States. Halliburton is one of the world's largest providers of products and services to the energy industry. Aboard the Deepwater Horizon, Halliburton was engaged in the cementing operations of the well and well cap.

27.     Defendant Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware Corporation with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas and process industries.  Cameron manufactured and/or supplied the Deepwater Horizon's blowout preventer valve ("BOP") that failed to activate at the time of the explosion.

28.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, Texas.  M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services.  M-I provided the drilling fluids for the Deepwater Horizon at the time of the explosion.

- 6 -

III.   **JURISDICTION AND VENUE**

29.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

30.   Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of the State of Florida which have been declared, pursuant to 43 U.S.C. § 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated.  Title 43 U.S.C. § 1331(1) extends exclusive Federal jurisdiction to the outer continental shelf.

31.   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy.

32.   This Court's venue over this action is proper under 28 U.S.C. § 1391(a)(2) because Plaintiffs who suffered injury reside in this district.

IV.   **FACTUAL ALLEGATIONS**

33.   Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001.  It was owned by Transocean and leased to BP through September 2013.  It was one of the largest rigs of its kind.

34.   BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the outer continental shelf off the coast of Florida.

35.   On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well

into a production well. "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of oil from the well.

36.     During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire, causing the deaths and injuries of many workers on the rig. Investigators believe the explosion was a blowout, likely caused by the cementing work the Deepwater Horizon had been performing. The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010.

37.     The Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the Deepwater Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out from the open end of the riser and from two places along its length.

38.     Although the now-leaking wellhead is fitted with a blowout preventer—known as a BOP and consisting of a stack of hydraulically activated valves at the top of the well designed to pinch the pipe closed, cut it, and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout—the response teams have been unable to activate the Deepwater Horizon's BOP.

39.     If the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiffs and Class Members millions of dollars in losses and damage.

-8-

40.     At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters.  The ever-expanding oil slick made landfall on Friday morning, April 30, 2010, and will continue to affect more and more of the Gulf coastline as it is driven landward by currents and winds. Although BP will begin drilling a relief well to stop the flow to the leaking well, the relief well may take months to complete, while oil continues to flow out of the leaking well.

41.     While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited supply of oil. Experts estimate that the volume of this continuous gush of oil will eclipse that of the Valdez spill within 45 days. In contrast, the relief well will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

42.     What is worse, the floating booms BP has set out to block the oil from reaching the coastline may be too low and/or be placed too far out to sea to be useful. Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers with it.  At times in the past week, the Gulf has experienced seven- to ten-foot swells, diminishing the usefulness of the booms.

43.     As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Florida, destroying the habitats where fish, shellfish, and crustaceans breed, spawn, and mature.

44.     The timing of this disaster makes it even more damaging, as May is spawning season for some sea life and migration time for the young of some species of shrimp and pelagic fish.

45.   Such devastation at the literal source of life for so many species will severely damage and perhaps even destroy the livelihoods of the Plaintiffs and Class Members, who rely on this sea life for their livelihoods.

46.   On May 2, 2010, the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for a minimum of ten days in Federal waters between Louisiana state waters at the mouth of the Mississippi River and the waters off Florida's Pensacola Bay, a total area of 6,800 square miles.  The NOAA may soon declare a "fisheries disaster" in the area.

47.   The Gulf region accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output, in total harvesting more than one billion pounds of finfish and shellfish per year. Nearly a third of all marine recreational fishing trips, including those part of the $1 billion per year sportfishing industry, take place on Gulf waters, according to the NOAA.  In 2008, the 3.2 million recreational fishermen in the Gulf of Mexico region took 24 million fishing trips.  All of these activities and businesses will be severely impacted or destroyed by this catastrophic spill.

48.   Not just Florida's Gulf coastline is at risk. Experts are predicting the spill will be picked up by the Gulf of Mexico's "loop current" this week, floating the oil slick along a "conveyor belt" down the Gulf coast of Florida, through the delicate ecosystem of the Florida Keys, and out into the Atlantic, where the Gulf Stream will carry the pollution up Florida's Atlantic coast.

49.   The risks of offshore drilling are well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea.  Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

50.     Moreover, Defendants knew the work the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

51.     Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

52.     Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

53.     The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. Defendants were aware of the high risk of blowouts from such deep drilling.

54.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP.

55.     A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.

"This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

56.     Defendants could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it.  In fact, in 2000 the MMS told Defendants and other oil rig operators that it considered a backup BOP activation system to be "an essential component of a deepwater drilling system." Despite that notice, and although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where BP operates, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

57.     Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are.  The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.

58.     Defendants' failure to take precautionary backup measures when drilling at depths they knew to be especially risky is made all the worse by the fact that Defendants were drilling so close to an extremely delicate and important natural resource: the Gulf Coast marshes, wetlands, and estuaries that are a wellspring of marine life, and the source of Plaintiffs' and Class Members' livelihoods.

59.     Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; Federal investigators found the explosion was in part due to cost-cutting and poor facility maintenance. Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP

875654.2

had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

60.     Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009, Defendant BP spent more than $16 million lobbying the Federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

61.     Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice.  The Deepwater Horizon incident is a tragic example to the contrary.

62.     The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants, which renders them jointly and severally liable to Plaintiffs and the Class Members for all their damages.

63.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, the Class Members, and the marine, coastal, and estuarine areas of Florida and the Gulf Coast where Plaintiffs and the Class Members work and earn a living.  Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

64.     After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill.  Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels of oil per day. Moreover,

Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

65.     The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses that cannot use the Gulf of Mexico and Florida's shore to work and to earn a living.

66.     There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

## V.     CLASS DEFINITION

67.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, who are members of the following Class:

> All Florida residents who claim injury and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the Deepwater Horizon drilling rig and the resulting oil spill.

68.     Excluded from the Class are:

(a)     the officers and directors of any of Defendants;

(b)     any judge or judicial officer assigned to this matter and his or her immediate family;

(c)     any individual who has claims for personal physical, bodily injury as a result of the April 20, 2010 explosion and fire that is the subject of this action; and

(d)     any legal representative, successor, or assign of any excluded persons or entities.

## VI.     CLASS ACTION ALLEGATIONS

69.     Plaintiffs' claims are made on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

875654.2

### A.  Numerosity of the Class

70.     On information and belief, the Class consists of hundreds or thousands individuals and/or businesses who have been legally injured by the disaster, making joinder impracticable.

### B.  Typicality and Commonality

71.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, have suffered adverse effects proximately caused by the disaster.

72.     Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.

### C.  Adequacy

73.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination and, specifically, catastrophic oil spills.

74.     Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their Counsel have interests adverse to those of the Class.

### D.  Predominance of Common Questions of Fact and Law

75.     There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

(a)     Whether Defendants caused and/or contributed to the explosion, fire, and oil spill;

(b)    Whether Defendants were negligent in the design, maintenance, manufacture, and/or operation of the of the oil rig, its pipes, valves, and other machinery and materials;

(c)    Whether Defendants knew or should have known of the risk of a major failure of the rig such as that which caused it to fail and resulted in the explosion, fire, and oil spill;

(d)    Whether Defendants knew of, or should have utilized, all available safety mechanisms to prevent a blowout and/or seal the wellhead;

(e)    Whether Defendants knew or should have known that their activities would cause damage to Plaintiffs;

(f)    Whether Defendants acted maliciously or with reckless disregard to the risk of a major failure of the rig, its pipes, valves, and other machinery and materials; and

(g)    The amount of damages Plaintiffs and the Class Members should receive in compensation.

## E.    **Superiority**

76.    Absent class treatment, Plaintiffs and Class Members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

77.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex environmental cases such as this, few could likely seek their rightful legal recourse. Absent a class action, Class Members would continue to incur harm without remedy.

78.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

## FIRST CLAIM FOR RELIEF
### Negligence

79.    Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

80.    The blowout explosion, fire, and resulting oil spill were caused by the joint negligence of the Defendants.

81.    Upon information and belief, Plaintiffs allege that the disaster was the result of Defendants' joint negligence in:

(a)    Failing to properly maintain and/or operate the Deepwater Horizon;

(b)    Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

(c)    Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

(d)    Acting in a careless and negligent manner;

(e)    Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

(f)    Failing to take appropriate action to avoid or mitigate the accident;

(g)    Negligently implementing policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)    Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

- 17 -

(i)    Failing to timely warn;

(j)    Failing to timely bring the oil release under control;

(k)    Failing to provide appropriate disaster prevent equipment;

(l)    Acting in a manner that justifies imposition of punitive damages; and

(m)    Such other acts and omissions as will be shown at the trial of this matter.

82.    The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

83.    Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

84.    Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' acts and omissions.

## SECOND CLAIM FOR RELIEF
### Gross Negligence

85.    Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

86.    Defendants owed a duty to all Plaintiffs and Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

87.    Defendants had a heightened duty of care to all Plaintiffs and the Class Members because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that Deepwater Horizon was performing at the time of the explosion.

88.     Defendants breached their legal duty to Plaintiffs and the Class, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including Plaintiffs and the Class Members, in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

89.     Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

90.     As a direct and proximate result of Defendants wanton or reckless conduct, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income, and other economic loss.

91.     Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

### THIRD CLAIM FOR RELIEF
#### Negligence *Per Se*

92.     Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

93.     Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state and federal laws, and permits issued under the authority of these laws.

94.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class Members.

95.     Defendants' violations of these statutory standards constitute negligence *per se* under Florida law.

96.    Defendants' violations of these statutory standards proximately caused Plaintiffs' and the Class Members' injuries, warranting compensatory and punitive damages.

## FOURTH CLAIM FOR RELIEF
### Strict Liability for Abnormally Dangerous Activity

97.    Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

98.    Defendants engaged in abnormally dangerous activities by the manner in which they maintained and operated the Deepwater Horizon. Defendants' activities resulted in the intentional, incidental, or accidental explosion, fire, and resulting oil spill from the Deepwater Horizon, which (a) created a high degree of risk of harm to others, and particularly to Plaintiffs; (b) created a risk involving a likelihood that the harm threatened by Defendants' activities would be great; (c) created a risk of harm that could not be avoided by the exercise of reasonable care; (d) were not a matter of common usage; ( e) were inappropriate to the place that they were being carried on, in that they constituted a non-natural use of the waters of the Gulf of Mexico, in close proximity to a delicate marine breeding ground, which imposed an unusual and extraordinary risk of harm to Plaintiffs relying on the fish and shellfish spawned in the affect areas for their livelihoods.

99.    As a direct and proximate result of Defendants' conduct in engaging in the abnormally dangerous activities alleged above, substantial amounts of crude oil have been released and continue to be released from the Macondo well leased by BP. It is precisely that risk of the type of harm that was ultimately sustained by Plaintiffs that makes Defendants' activities abnormally dangerous.

100.    Plaintiffs are entitled to a judgment finding Defendants liable for damages, including punitive damages, suffered as a result of Defendants' abnormally dangerous activities

and awarding Plaintiffs adequate compensation therefore in amounts determined by the trier of fact.

### FIFTH CLAIM FOR RELIEF
### Strict Products Liability for Manufacturing Defect

101.   Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

102.   Defendant Cameron manufactured and/or supplied the Deepwater Horizon's BOP.

103.   At the time of, and since the explosion, Defendant Cameron's BOP failed to operate properly or at all, and this failure caused or contributed to the oil spill.

104.   Defendant Cameron's BOP was defective because it failed to operate as intended, either by manual trigger or by automatic trigger.

105.   As a result of the BOP product defect, oil was discharged and continues to be discharged from the Deepwater Horizon, causing injury to Plaintiffs and the Class Members.

106.   Defendant Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when the BOP left Defendant Cameron's control.

107.   At all times, Defendant Cameron's BOP was used in the manner intended.

108.   By reason of the foregoing, Plaintiffs have incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages.

### SIXTH CLAIM FOR RELIEF
### Strict Liability Pursuant to the Florida Pollutant Discharge Prevention and Control Act, Fla. Stat. § 376.011, *et seq.*

109.   Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

- 21 -

110.    At all relevant times, Defendants owned, leased, operated, and/or maintained the Deepwater Horizon and the Macondo well. Following the April 20, 2010 explosion, fire, and ultimate sinking of the Deepwater Horizon, the Macondo well began leaking crude oil into the Gulf of Mexico, and it has continuously leaked since then.

111.    At all relevant times, Defendants had a statutory duty to Plaintiffs and Class Members to maintain and operate the Deepwater Horizon so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Act"), Fla. Stat. § 376.031.

112.    At all relevant times, Defendants breached their statutory duty to the Plaintiffs and Class Members by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the massive oil spill to migrate into Florida's marine, coastal, and estuarine areas, in violation of the Act, Fla. Stat. §§ 376.011 - 376.21. Those affected waters, estuaries, marshes, and shores are the source of Plaintiffs' and Class Members' livelihoods.

113.    Defendants are strictly liable to Plaintiffs and Class Members under the Act, § 376.205, which provides in pertinent part:

> ... any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

114.    As the direct and proximate result of Defendants' breach of statutory duty to the Plaintiffs, the oil spill originating from the Deepwater Horizon has resulted in detrimental effects upon the Gulf of Mexico and Florida's marine, coastal, and estuarine areas which Plaintiffs rely on for income.

115.   By reason of the foregoing, Plaintiffs have incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants, jointly and severally, as follows:

A.   An order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

B.   Economic and compensatory damages in amounts to be determined at trial;

C.   Punitive damages;

D.   Pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.   Attorneys' fees and costs; and

F.   Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

DATED: May 6, 2010

Dewitt M. "Sparky" Lovelace (Fl. Bar # 0872326)
Alex Peet (Fl. Bar # 47606)
LOVELACE LAW FIRM, P.A.
12870 U.S. Highway, 98 West, Suite 200
Miramar Beach, FL  32550
Telephone:  (850) 837-6020
Facsimile:  (850) 837-4093

875654.2

Don Barrett (*pro hac vice* to be filed)
David McMullan (*pro hac vice* to be filed)
Brian Herrington (*pro hac vice* to be filed)
DON BARRETT, P.A.
P.O. Box 987
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-9168
Facsimile: (662) 834-2628

Richard R. Barrett (*pro hac vice* to be filed)
LAW OFFICES OF RICHARD R. BARRETT
P.O. Box 339
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-4960
Facsimile: (866) 430-5459

Zach Butterworth (*pro hac vice* to be filed)
Gary Yarborough, Jr. (*pro hac vice* to be filed)
HESSE & BUTTERWORTH, PLLC
841 Highway 90
Bay St. Louis, MS 39520
Telephone: (228) 466-0020
Facsimile: (228) 466-0550

Larry D. Moffett (*pro hac vice* to be filed)
DANIEL COKER HORTON & BELL, P.A.
265 North Lamar Boulevard, Suite R
P.O. Box 1396
Oxford, MS 38655-1396
Telephone: (662) 232-8979
Facsimile: (662) 232-8940

Edward C. Taylor (*pro hac vice* to be filed)
Brenda G. Long (Fla. Bar #0237530)
DANIEL COKER HORTON & BELL, P.A.
1712 15th Street, Suite 400
Post Office Box 416
Gulfport, MS 39502-0416
Telephone: (228) 864-8117
Facsimile: (228) 864-6331

Randall A. Smith (*pro hac vice* to be filed)
Zach Butterworth (*pro hac vice* to be filed)
J. Geoffrey Ormsby (*pro hac vice* to be filed)
Hiawatha Northington, II (*pro hac vice* to be filed)
SMITH & FAWER, L.L.C.
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200
Facsimile: (504) 525-2205

Dawn M. Barrios (*pro hac vice* to be filed)
Bruce S. Kingsdorf (*pro hac vice* to be filed)
Zachary L. Wool (*pro hac vice* to be filed)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139-3650
Telephone: (504) 524-3300
Facsimile: (504) 524-3313

Charles Barrett (*pro hac vice* to be filed)
BARRETT & ASSOCIATES, P.A.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
Telephone: (615) 515-3393
Facsimile: (615) 515-3395

Elizabeth A. Alexander (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue N., Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Steven E. Fineman (*pro hac vice* to be filed)
Wendy R. Fleishman (*pro hac vice* to be filed)
Annika K. Martin (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

875654.2

Elizabeth J. Cabraser (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for Plaintiffs and the Class*

875654.2